IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED IRONWORKERS, INC., | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) Case No. 3:18-CV-553-NJR-DGW |
| TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, TRAVELERS INDEMNITY COMPANY, NEC INSURANCE, INC., and PAUL K. DICKEY, | ) ) ) ) ) ) ) |
| Defendants. | ) |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

This matter is before the Court on the Motion to Dismiss Count III of Plaintiff's Amended Complaint filed by Defendant NEC Insurance, Inc. ("NEC") (Doc. 41), the Motion to Dismiss filed by Defendants Travelers Indemnity Company and Travelers Property Casualty Company of America ("Travelers" or "Travelers Defendants") (Doc. 49), and the Motion to Stay Arbitration filed by Plaintiff United Ironworkers, Inc. ("United") (Doc. 45). For the reasons set forth below, the Court grants the motions to dismiss.

## JURISDICTION

On December 18, 2017, United filed a complaint against Travelers and NEC in the Circuit Court for Randolph County, Illinois (Doc. 1). Travelers was served on February 7, 2018, and NEC was served on February 8, 2018 (Docs 1-1, 1-3). On March 8, 2018, Travelers and NEC jointly removed the case to this Court under 28 U.S.C. §§ 1332 and 1441, as the case falls within this Court's diversity jurisdiction (*Id.*). Specifically, United is an Illinois

corporation with its principal place of business in Steeleville, Illinois, the Travelers Defendants are both Connecticut corporations with their principal place of business in Hartford, Connecticut, and NEC is a Missouri corporation with its principal place of business in Pacific, Missouri (*Id.*). Additionally, the $75,000 amount in controversy requirement is met, as United claims it was overcharged $1,791,512 under the insurance policies at issue and also seeks punitive damages.

On April 25, 2018, United filed an Amended Complaint adding Paul Dickey as a defendant, as well as a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964, *et seq.* Dickey's citizenship has not been pleaded and is unknown for purposes of diversity jurisdiction; however, the RICO claim creates federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## BACKGROUND

United is a company that specializes in assembling rebar inside concrete and in the erection of structural steel (Doc. 28, ¶ 3). Defendant Paul Dickey was the Controller/Account Manager for United until the end of 2016 (*Id.*, ¶ 6). As the Controller, Dickey was responsible for securing the company's workers' compensation insurance policies (*Id.*). Dickey retained NEC as United's insurance broker and allegedly took payments from NEC in the form of dinners, golf, drinks, and other entertainment for himself and his girlfriend (*Id.*). In exchange, Dickey allegedly misrepresented and concealed from United's President Kim Rasnick the "fraudulent and excessive nature" of the workers' compensation policies he obtained through NEC (*Id.*). Dickey allegedly also prevented other brokers from bidding for United's workers' compensation insurance business (*Id.*).

On behalf of United, Dickey executed contracts—called Insurance Program

Agreements (IPAs)—for workers' compensation insurance with Travelers in 2015 and 2016. These IPAs charged United for both "guaranteed cost coverage" and "retrospective coverage," which in effect "double-billed" United (*Id.*, ¶ 8). Meanwhile, the actual insurance policies for 2015 and 2016 only reflected premium payments for "retrospective" coverage (*Id.*).

United alleges that NEC, which had an obligation to provide United with sufficient information to obtain accurate information regarding premiums and coverage, engaged in a scheme with Dickey and an agent for Travelers to defraud United (*Id.*, ¶ 10). United claims NEC had an interest in Travelers receiving the highest possible premiums because it was paid by Travelers based on the total premiums paid and that Travelers benefitted from this "corrupt NEC arrangement" (*Id.*, ¶¶ 12-13). Meanwhile, Dickey concealed that Travelers was double-billing United and mischaracterized payments of retrospective premiums, claiming the payments were for underestimated payroll (*Id.*, ¶10).

Prior to 2015, Travelers, through United's broker NEC, provided workers' compensation coverage to United through a guaranteed cost policy. In May 2014, however, Travelers greatly over-reserved for a single employee claim, raising the workers' compensation plan's reserve by $777,193. This drove United's experience modification rate ("EMR") to a point where United had to seek insurance for workers' compensation either through the state risk pool, which was served only by Travelers, or directly from Travelers (*Id.*, ¶ 13). United alleges neither Travelers nor NEC investigated the May 2014 increase in reserves, which led to United paying exorbitant premiums when the cost guaranteed policy of previous years was changed to a cost guaranteed and retrospective policy (*Id.*). United claims it paid an additional premium of more than $800,000 per year as a result, even though,

as of March 16, 2015, the United employee was back at work full time with no work restrictions and the reserve could have been reduced to more accurately reflect the exposure (*Id.*, ¶¶ 13, 19).

United also claims Travelers and NEC did not deliver the applicable insurance documents for signature until after the 2015 and 2016 policy years had begun (*Id.*, ¶ 20). While a proposal was sent to Dickey on December 19, 2014, the actual 2015 policy was not issued until January 20, 2015 (*Id.*). The 2016 policy was not signed by Dickey until January 22, 2016 (*Id.*, ¶¶ 21-22). United alleges this violated Illinois law, which requires an insurance company to notify its insured within thirty days from the expiration of the policy in order to give the insured time to obtain quotes for replacement coverage (*Id.*, ¶ 23). United contends this eliminated any realistic possibility for it to obtain quotes from other insurers and asserts this was a scheme developed by Travelers and NEC to put United in the position of having no other insurance options other than insuring again with Travelers (*Id.*).

United further claims there are misrepresentations in the insurance policies themselves. According to United, the 2015 and 2016 policies are described only as retrospective policies, not as guaranteed cost policies (*Id.*, ¶ 24). The policies provide that "the only agreements relating to this insurance are stated in this policy. The terms of this policy may not be changed or waived except by endorsement issued by us to be part of this policy." To United's knowledge, no endorsement was ever issued (*Id.*). Therefore, it alleges, the guaranteed cost premium was fraudulently added to the retrospective plan. United estimates that Travelers overcharged premiums by at least $1.782 million over 2015 and 2016 (*Id.*, ¶ 28).

United's Amended Complaint asserts three counts. Count I is a claim under the Illinois Consumer Fraud and Deceptive Business Practice Act against Travelers ("ICFA") (*Id.*,

¶¶ 32-40). Count II asserts a breach of contract claim against NEC (*Id.*, ¶¶ 41-48). Count III asserts a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO") against Travelers, NEC, and Dickey (*Id.*, ¶¶ 49-66).

On March 22, 2018, Travelers demanded that United arbitrate all disputes arising out of or concerning the payment of premium or other program charges (Doc. 49-1). In doing so, Travelers relied on identical arbitration provisions in the 2015 and 2016 IPAs (Doc. 28-6, pp. 27-29; Doc. 28-9, pp. 2-4). While objecting to arbitration, United also named its party-appointed arbitrator so as to not waive any rights regarding the selection of the arbitrator.

On May 24, 2018, in response to United's Amended Complaint, NEC filed a motion to dismiss Count III, the RICO Act claim against all Defendants, for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure (Doc. 41). On May 29, 2018, Travelers filed a motion to dismiss Counts I and III of the Amended Complaint under Rule 12(b)(3) because those claims are subject to the arbitration provisions contained in the IPAs for 2015 and 2016 (Doc. 49).[1] Alternatively, Travelers asks the Court to dismiss those counts under Rule 12(b)(6) for failure to state a claim.

Also before the Court is a motion to stay arbitration filed by United (Doc. 45). United asserts that its ICFA and RICO claims do not fall within the scope of the arbitration agreement. Accordingly, the arbitration proceedings should be stayed pending the Court's ruling on the motions to dismiss.

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is meant to "test

---

[1] Travelers also filed a Motion to Dismiss the original Complaint. Because the Amended Complaint is now the operative pleading, Travelers' first Motion to Dismiss (Doc. 24) is moot.

the sufficiency of the complaint, not to decide the merits" of the case. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990) (citation omitted). In evaluating a motion to dismiss, the Court must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Cole v. Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 903 (7th Cir. 2011); *Thompson v. Ill. Dep't. of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002). Pursuant to Federal Rule of Civil Procedure 8(a)(2), a complaint must include a short and plain statement of the claim, showing that the pleader is entitled to relief. FED. R. CIV. P. 8(a)(2). Accordingly, the Court may grant a motion to dismiss under Rule 12(b)(6) only if a complaint lacks "enough facts to state a claim [for] relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 697, 129 S. Ct. 1937, 1960 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)); *Swanson v. Citibank*, N.A., 614 F.3d 400, 404 (7th Cir. 2010).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1955). While a complaint need not include detailed factual allegations, there "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1955). These requirements ensure that "the defendant [receives] fair notice of what the . . . claim is and the grounds upon which it rests . . . ." *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1964 (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 103 (2007)).

In the context of a defendant's motion to dismiss for improper venue under Rule 12(b)(3), the plaintiff bears the burden of proving that venue is proper. *See Nathan v. Morgan*

*Stanley Renewable Dev. Fund, LLC*, No. 11 C 2231, 2012 WL 1886440, at *11 (N.D.Ill. May 22, 2012) (Lefkow, J.) (citing *Interlease Aviation Invs. II (Aloha) LLC. v. Vanguard Airlines, Inc.*, 262 F.Supp.2d 898, 913 (N.D. Ill. 2003) (Alesia, J.)). In making this determination, a "court may examine facts outside the complaint . . . ." *First Health Grp. Corp. v. Sanderson Farms, Inc.*, No. 99 C 2926, 2000 WL 139474, at *2 (N.D. Ill. Jan. 31, 2000) (Manning, J.) (citations omitted).

## Discussion

### I. Travelers' Motion to Dismiss for Improper Venue Pursuant to the IPAs' Arbitration Provisions

Travelers first moves to dismiss Counts I and III of the Amended Complaint under Rule 12(b)(3) because they fall under the arbitration provision contained in the executed IPAs for 2015 and 2016 (Doc. 49).

"[T]he Seventh Circuit has instructed district courts that a motion seeking dismissal based on an arbitration agreement should be decided under Rule 12(b)(3) . . . ." *Soucy v. Capital Mgmt. Servs., L.P.*, No. 14 C 5935, 2015 WL 404632, at *3 (N.D. Ill. Jan. 29, 2015) (citing *Gabbanelli Accordions & Imports, LLC v. Gabbanelli*, 575 F.3d 693, 695 (7th Cir. 2009)); *Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 807 (7th Cir. 2011) (quoting *Auto. Mechs. Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 746 (7th Cir. 2007) ("[W]e have held that a motion to dismiss based on a contractual arbitration clause is appropriately "conceptualized as an objection to venue, and hence properly raised under Rule 12(b)(3).")). When ruling on a motion to dismiss for improper venue, the district court is not "obligated to limit its consideration to the pleadings [or to] convert the motion to one for summary judgment" if the parties submit evidence outside the pleadings. *Faulkenberg*, 637 F.3d at 809-10 (quoting *Cont'l Cas. Co. v. Am. Nat. Ins. Co.*, 417 F.3d 727, 733 (7th Cir. 2005)).

The Federal Arbitration Act ("FAA") requires courts "to place written arbitration agreements on the same footing as other contracts." *Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748, 752 (7th Cir. 2017); *see also Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012) (The FAA "embodies both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract."). Pursuant to the FAA, arbitration should be compelled if three elements are present: (1) an enforceable written agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal to arbitrate. *Scheurer*, 863 F.3d at 752. "[A]n enforceable agreement to arbitrate must first exist between the parties before the courts can compel arbitration." *Stone v. Doerge*, 245 F.Supp.2d 878, 881 (N.D. Ill. 2002), *aff'd*, 328 F.3d 343 (7th Cir. 2003). "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Gore*, 666 F.3d at 1032 (citation omitted).

Whether a dispute is subject to arbitration pursuant to a valid arbitration agreement is a threshold issue to be decided by the court. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83-83 (2002). When the existence of a binding arbitration agreement is in dispute, "the district court must accept the non-movant's evidence as true, drawing all reasonable inferences in his favor." *Sanato v. Sears, Roebuck & Co.*, No. 15-CV-7486, 2016 WL 9631332, at *2 (N.D. Ill. Feb. 11, 2016).

A.  *Validity of the Arbitration Provisions*

In this case, Travelers argues that the 2015 and 2016 IPAs contained valid arbitration provisions stating that "any arbitration proceeding arising out of or related to this Agreement shall be governed by the Federal Arbitration Act ('FAA')." And under Connecticut law, the law under which the IPAs state they are to be governed, an agreement in a contract to settle

Page **8** of **18**

by arbitration any controversy arising out of that contract shall be valid, irrevocable, and enforceable. *See* CONN. GEN. STAT. § 52-408. Because it is undisputed that United signed the contracts containing the arbitration provisions, Travelers asserts, they are valid and enforceable.

United does not dispute that it, via Dickey, executed written contracts containing arbitration provisions (Docs. 28-6, 28-7, 28-8, 28-9, 28-10). Instead, United challenges the validity of the formation of the 2015 and 2016 IPAs as a whole. It is well-established, however, that "[u]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445–46 (2006). Thus, "a court may consider a claim that a contracting party was fraudulently induced to include an arbitration provision in the agreement <u>but not claims that the entire contract was the product of fraud</u>." *James v. McDonald's Corp.*, 417 F.3d 672, 680 (7th Cir. 2005) (emphasis added) (citing *Sweet Dreams Unlimited v. Dial–A–Mattress Int'l, Ltd.*, 1 F.3d 639, 641 n. 4 (7th Cir. 1993)).

That is exactly the claim United is making here: the contracts signed by United were the result of Travelers' unfair or deceptive acts and, thus, are invalid. United's citation to *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010), is unhelpful to its position, as United apparently confuses the Supreme Court's reference to "formation of the parties' arbitration agreement" with formation of the agreement generally. *See Granite Rock*, 561 U.S. at 299-302. Because it is undisputed that the 2015 and 2016 IPAs contained valid arbitration provisions, the issue of whether the contracts themselves were validly formed is an issue is for the arbitrator, not this Court, to decide.

B.  *Scope of the Arbitration Provisions*

Travelers next argues that United's claims are within the scope of the arbitration provisions. The IPAs' arbitration provisions cover disputes "about the parties' rights and duties relative to payment of premiums and other charges under this Agreement and the Policies" and all disputes regarding "whether and how much [Travelers'] claims handling practices . . . may impact the amount of premiums and other charges which [United] may owe [Travelers] under this Agreement and the Policies." Travelers asserts that United cannot avoid arbitration by framing its claims against Travelers as violations of the ICFA and the RICO Act.

In response, United asserts that its ICFA claim goes to "the very heart of the sale of this insurance contract" and is not simply about the payment of insurance premiums or claim handling (Doc. 56, p. 8). With regard to its RICO claim, United criticizes Seventh Circuit case law holding that RICO claims are arbitrable and goes on to assert that this case is not a simple dispute regarding payment of insurance premiums or a "garden-variety contract claim" intended to be governed by the arbitration clause.

Whether a party has agreed to arbitrate a particular dispute is a question for the courts to decide. *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. TriMas Corp.*, 531 F.3d 531, 535 (7th Cir. 2008). In determining whether a contract's arbitration clause applies to a dispute, federal courts apply state-law principles of contract formation. *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012) (citing *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 662 (7th Cir. 2002)). If it is clear that the parties have a contract providing for arbitration of some issues between them, any doubt concerning the scope of the arbitration clause is resolved in favor of arbitration as a matter of federal law. *Id.*

"Therefore, a court should compel arbitration 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Welborn Clinic v. MedQuist, Inc.*, 301 F.3d 634, 639 (7th Cir. 2002) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)). "Despite this strong pro-arbitration tilt, agreements must not be construed so broadly as to force arbitration of claims that the parties never agreed to submit to arbitration." *Id.*

In Illinois, courts interpret contracts to ascertain and give effect to the intent of the parties by considering "the objective manifestations of the parties, including the language they used in the contract." *Id.* (quoting *Carey v. Richards Bldg. Supply Co.*, 856 N.E.2d 24, 27 (Ill. App. Ct. 2006)). Where the contract's language is plain, the agreement should be enforced as written. *Id.*

In this case, the arbitration provision in both the 2015 and 2016 IPAs are narrowly written. They do not, as many arbitration provisions often do, provide for the resolution of all claims and controversies "arising out of or relating to" the contract. Instead, the provisions specifically state that the parties agree to arbitrate disputes involving "the parties' **rights and duties relative to payment of premium and other charges** under this Agreement and the Policies" and "whether and how much [Travelers'] **claims handling practices (e.g., investigation, administration, payments in connection with any claims under the Policies) may impact the amount of premium and other charges** which [United] may owe to [Travelers]" (Doc. 28-6, p. 27; Doc. 28-9, p. 2) (emphasis added).

In its ICFA claim, United alleges, among other things, that Travelers over-reserved for a single employee claim, thereby artificially inflating United's loss history and increasing the future premiums United would have to pay because of the claim by one employee (Doc. 28,

Page **11** of **18**

¶¶ 34, 39(g)). United also alleges Travelers put its own interests ahead of United by "double-billing" United for insurance premiums while also failing to advise United of that fact (*Id.*, ¶¶ 37-39(d)).

The Court finds that these issues relate to United's duty to pay premiums and Travelers' claim-handling practices and, thus, fall within the scope of the arbitration provisions in the 2015 and 2016 IPAs. At the very least, the Court cannot positively say that the arbitration clause cannot be interpreted to cover the asserted dispute, and any doubt must be resolved in favor of arbitration. Thus, United's ICFA claim is subject to arbitration.

The same cannot be said, however, for United's RICO claim. In sum, United alleges Travelers, NEC, and Dickey created an enterprise with the common purpose of defrauding United by over-reserving, double-billing, and preventing other insurance brokers from quoting insurance. While United does allege that Travelers' double-billing and charging of excessive premiums was part of the scheme, when viewed as a whole, the RICO claim relates more generally to Defendants' concerted efforts to defraud United. These allegations do not fall within the limited scope of the arbitration provisions and, therefore, are not subject to arbitration.

C. *Waiver*

Lastly, United argues that Travelers waived arbitration when it removed the case to this Court rather than immediately enforcing its arbitration rights in state court. This argument is a non-starter.

It is true that the "election to proceed before a nonarbitral tribunal for the resolution of a contractual dispute is a presumptive waiver of the right to arbitrate." *Cabinetree of Wisconsin, Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 390 (7th Cir. 1995). For an enforcing

party to waive its arbitration rights, it must have acted inconsistently with an intent to arbitrate—an inconsistency that can be demonstrated by the enforcing party's actions throughout the case. *Kawasaki Heavy Indus., Ltd. v. Bombardier Recreational Prods., Inc.*, 660 F.3d 988, 995 (7th Cir. 2011). A number of points are relevant to the implied waiver inquiry, among them the extent of a party's diligence in seeking arbitration, the extent of a party's delay in moving for arbitration, and the extent of the party's participation in litigation, including its participation in discovery. *Cooper v. Asset Acceptance*, LLC, 532 F. App'x 639, 641 (7th Cir. 2013).

To date, Travelers has not engaged in any discovery. While it did remove the case to this Court on the basis of diversity jurisdiction, it has taken no other steps to litigate the case in federal court. Instead, it responded to United's complaint with a Motion to Dismiss the counts against it because United's claims are subject to arbitration. *See All Am. Roofing, Inc. v. Zurich Am. Ins. Co.*, 934 N.E.2d 679, 684 (Ill. App. Ct. 2010). When United subsequently filed an Amended Complaint, Travelers again responded with a Motion to Dismiss. Because Travelers has not acted inconsistently with its intent to arbitrate, the Court finds that Travelers has not waived its arbitration rights.

Because the 2015 and 2016 IPAs contain valid arbitration provisions that apply to United's ICFA claims, and because the IPAs direct arbitration outside this District, dismissal of United's ICFA claim for lack of venue under Rule 12(b)(3) is appropriate. United's RICO claim is not subject to arbitration, however, and it remains in this action.

**II.   Travelers' and NEC's Motion to Dismiss United's RICO Act Claim**

Having dismissed the ICFA claim for improper venue, the Court now turns to Defendants' Motions to Dismiss Count III of the Amended Complaint for failure to state a

claim. Defendants argue that Count III should be dismissed because United has failed to adequately allege the elements of a RICO Act claim.

As argued by NEC, the purpose of the RICO Act was to eradicate organized crime in the United States and curb the infiltration of legitimate business organizations by racketeers, not to cover all instances of wrongdoing or turn garden-variety state law fraud claims into RICO claims. *See* Pub. L. No. 91-452, 84 Stat. 922 (1970); *Jennings v. Auto Meter Products, Inc.*, 495 F.3d 466, 472 (7th Cir. 2007); *Gamboa v. Velez*, 457 F.3d 703, 710 (7th Cir. 2006) ("Civil RICO plaintiffs persist in trying to fit a square peg in a round hole by squeezing garden-variety business disputes into civil RICO actions. While the scope of civil RICO extends beyond the prototypical mobster or organized crime syndicate, it is equally evident that RICO has not federalized every state common law cause of action available to remedy business deals gone sour."). Yet, that is what United is attempting to do in this case: turn ordinary business relationships into a criminal enterprise.

United seeks relief under 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Accordingly, to state a claim for a RICO violation, a plaintiff must allege a cognizable injury to its business or property resulting from the "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).

The Supreme Court has explained that "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the

enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). While an enterprise can be informal, *i.e.*, not a legal entity, it must have some structure, evinced by a common purpose, some longevity, and relationships among those associated with it. *Patel v. Fendler*, No. 15-CV-0366-MJR-PMF, 2016 WL 6248285, at *2 (S.D. Ill. Oct. 26, 2016) (citing *Boyle*, 556 U.S. at 945-47). Each person or entity targeted for liability for a violation of 18 U.S.C. § 1962(c) must have "participated in the operation or management" of the enterprise, such that it played a role "in directing the enterprise's affairs" and not just its own operations. *Id.* (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)). Furthermore, the enterprise must engage in a pattern of "racketeering," which is defined as behavior that violates certain enumerated federal statutes or state laws addressing specific topics and bearing specific penalties. *Guaranteed Rate, Inc. v. Barr*, 912 F. Supp. 2d 671, 681 (N.D. Ill. 2012) (citing 18 U.S.C. §§ 1962(c); 1961(1)).

Here, United asserts Travelers, NEC, and Dickey constituted an enterprise whose activities affected interstate or foreign commerce in that Travelers and NEC provided insurance policies throughout the country. Moreover, the enterprise had the common purpose to defraud United of money and property. United claims Travelers hatched the scheme by greatly over-reserving for a single employee claim, driving United's EMR to the point that United would be put in a risk pool serviced only by Travelers. Then NEC, "whose actions can be imputed to Travelers, was corrupting United's Controller, Mr. Dickey." This corruption allegedly enabled NEC to offer only Travelers policies in 2015 and 2016 without Dickey soliciting any other bids for workers' compensation policies. To top it off, the policies issued by Travelers were inflated and double-billed United.

For at least three years, United asserts, Travelers, NEC, and Dickey worked together

to defraud United by over-reserving, double-billing, and preventing other insurance brokers from quoting insurance. United claims each party directed the enterprise's affairs in that Travelers directed the scheme to over-reserve and double-bill (and then hide the double-billings by having Dickey sign the IPAs rather than the actual policies), NEC directed the enterprise by "compromising" Dickey so that he would continue to retain NEC as United's broker, and Dickey directed the enterprise by preventing another insurance broker from soliciting competing workers' compensation bids for United. United then asserts that Defendants engaged in racketeering activity (mail and wire fraud) by causing various documents, including proposed insurance policies, IPAs, invoices, and payments to be transmitted in interstate commerce and interstate mail. Finally, United claims there was a pattern of racketeering in that for close to three years Defendants engaged in mail and wire fraud for the purpose of preventing another insurance broker who could solicit competitive bids to be hired.

NEC and Travelers argue that these allegations amount to nothing more than the makings of ordinary business relationships. While United claims Travelers, NEC, and Dickey worked together with a common purpose, there are no allegations that suggests Travelers was in on the alleged scheme between NEC and Dickey or that Travelers and Dickey even knew each other. Furthermore, while United tries to imply that NEC's actions could be imputed to Travelers, it also describes NEC as a separate corporate entity and independent broker. And, Travelers notes, independent brokers like NEC are agents of the insured, not the insurer. Indeed, there are no factual allegations, Defendants contend, that indicate the parties promoted the alleged enterprise as a distinct entity "rather than simply pursuing their own individual affairs and interests." *See Saleh v. Merchant*, No. 14-CV-09186, 2018 WL

287748, at *4 (N.D. Ill. Jan. 4, 2018). Even if the Court were to believe that United was conned into purchasing exorbitant Travelers workers' compensation policies because NEC bought off Dickey with dinner, golf, and drinks, Defendants assert there are no factual allegations to demonstrate that Defendants "joined together to create a distinct entity" for those purposes. *See United Food & Commer. Workers Union & Emplrs. Midwest Health Bens. Fund v. Walgreen Co.*, 719 F.3d 849, 855 (7th Cir. 2013).

First, the Court notes that, according to the docket, Dickey has never been served with the Amended Complaint. United never requested summons to be issued as to Dickey, and the time for doing so has expired. *See* FED. R. CIV. P. 4(m). Accordingly, the Court finds Dickey should be dismissed for United's failure to prosecute pursuant to Rule 41(b).

But even if Dickey had been properly served, the Court finds that United's allegations fall short of stating a facially plausible RICO claim because United has not adequately alleged that Defendants were conducting the affairs of an enterprise. In fact, United has not alleged any facts connecting Travelers with NEC's payments or gifts to Dickey, other than claiming that NEC's actions can be "imputed" to Travelers (even though NEC was United's agent, not Travelers' agent). And there is no indication that anyone from Travelers even knew who Dickey was.

United simply has not alleged any facts creating a reasonable inference that Defendants were acting in concert on behalf of an enterprise as opposed to conducting their own affairs to advance their own self-interests. *See United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 854 (7th Cir. 2013). Because United has not adequately alleged an essential element of a RICO Act claim, the claim must be dismissed pursuant to Rule 12(b)(6), and Defendants' Motions to Dismiss as

to Count III must be granted.

## Conclusion

For these reasons, the Motion to Dismiss filed by the Travelers Defendants (Doc. 49) is **GRANTED**. Travelers' first Motion to Dismiss (Doc. 24) is **DENIED as moot**. The Motion to Dismiss filed by NEC Insurance, Inc. (Doc. 41) is **GRANTED**. Count I is dismissed for improper venue pursuant to Rule 12(b)(3), as it is subject to arbitration in Connecticut. Count III is dismissed with prejudice for failure to state a claim pursuant to Rule 12(b)(6). The Motion to Stay Arbitration filed by Plaintiff United Ironworkers, Inc. (Doc. 45) is **DENIED as moot**. Finally, Defendant Paul Dickey is **DISMISSED without prejudice** for failure to prosecute.

The only claim currently remaining in this case is Count II, United's claim for breach of contract against Defendant NEC.

**IT IS SO ORDERED.**

**DATED: January 2, 2019**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**